**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

STEVEN RAY WILKERSON                    *

Plaintiff                               *

v                                       *          Civil Action No. JFM-13-2811

DR. ALI, et al.                         *

Defendants                              *
                                      ***

**MEMORANDUM**

The above-captioned civil rights complaint concerns plaintiff's medical care during his incarceration at the Metropolitan Transition Center (MTC) and Jessup Pre-Release Unit (JPRU).[1] Plaintiff seeks injunctive relief ordering defendants to provide plaintiff with treatment for his pain as well as monetary damages.  *See* ECF 1, 10, and 14.  This court ordered counsel for the Division of Correction to respond to plaintiff's initial request for preliminary injunction, in light of plaintiff's assertions he was receiving no treatment for serious symptoms of back pain.  ECF 4 and 6.  Preliminary injunctive relief was denied on November 12, 2013.  ECF 8.

Medical staff and the corporate contractors who are named as defendants filed motions to dismiss or for summary judgment.  ECF 19 and 23.  Plaintiff was advised of his right to file an opposition response to the dispositive motions (ECF 20 and 24), but has opposed neither motion. The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014).

In his complaint plaintiff states he had neck surgery on June 21, 2013, which involved fusion of his cervical spine extending from level C3 to level C7.[2]  ECF 1 at p. 4.   Plaintiff states

---

[1]   Plaintiff was released from incarceration during the pendency of this lawsuit.  ECF 17.

[2]   Cervical spinal fusion is a surgery that joins selected bones in the neck.  *See* http://www.webmd.com/back-pain/cervical-spinal-fusion.

the surgery involved use of screws, rods, and plates to align his cervical spine. *Id*. The surgery

was performed at the Peninsula Regional Medical Center (PRMC) by Dr. Jarek M. Malik. *Id*.

    Plaintiff claims that on September 12, 2013, two weeks prior to the filing of this lawsuit,

something popped in his neck and he was seen by medical staff at the Baltimore Correctional

Center (BCCC). At that time, plaintiff states he could not walk and had no feeling in his left leg

and arm. Plaintiff was transferred to MTC and was confined to the infirmary. He states he was

carried up one flight of steps by another inmate and was dropped twice while being carried, but

was not seen until the following day by defendant Dr. Ali.   Plaintiff alleges that Ali was

skeptical of plaintiff's injuries and suggested he was "pill seeking" when plaintiff asked for

additional pain medication. Plaintiff states he received two 5 mg tablets of Percocet after telling

Ali his pain level was an eight on a scale of 1 to 10, but the medication was ineffective. ECF 1 at

p. 5. Plaintiff was sent to Bon Secours Hospital ("Bon Secours") emergency room after telling

Ali that he could not bear weight on his left leg and had no feeling in his left leg and arm. *Id*. at

p. 6.

    Plaintiff states he was given a CT scan of his neck at the emergency room and the doctor

told him "everything looked okay" with plaintiff's neck. He recommended that plaintiff follow

up with a neurosurgeon. Plaintiff was discharged from the emergency room to MTC where he

was seen the following day by Dr. Ali. Plaintiff claims that Dr. Ali asked him for the paperwork

from Bon Secours and when plaintiff told him that it was given to the escorting security officer,

Ali became angry. Plaintiff alleges Dr. Ali asked, "why the hell didn't you tell them about your

back?" ECF 1 at p. 7. Plaintiff assured Dr. Ali he had told the doctor about his back and that the

doctor at the hospital had recommended an MRI in addition to the tests already performed. *Id*.

Plaintiff alleges that Dr. Ali continued to accuse him of "pill seeking" and decreased his pain medication to the same dosage, but to be taken every eight hours instead of every four hours.  ECF 1 at p. 7.  On September 20, 2013, plaintiff claims that Ali came into the room where plaintiff was confined and insisted that he attempt to bear weight on his left leg and walk, but plaintiff fell to the ground when he tried to do so.  *Id*.  Plaintiff asserts he needs surgery on his lumbar spine.  *Id*. at p. 8.  As relief, plaintiff seeks an injunction preventing Dr. Ali to continue any medical care for him and one-million dollars in compensatory and punitive damages.  *Id*.

In opposition to the response to show cause filed by Division of Correction counsel, plaintiff adds that on October 12, 2013, he was instructed to wear a back brace due to a fracture to his spine and associated pain.  Plaintiff claimed he was prescribed the brace by physicians at the University of Maryland Medical Center (UMMC) where he was treated from October 9, 2013 through October 12, 2013.  As of November 6, 2013, plaintiff claimed he had not received the back brace.  In addition, plaintiff disputes the allegations made by Dr. Ali that plaintiff was malingering and that he was caught "conspiring with" another inmate while confined to the infirmary.  Plaintiff also alleged he was not provided physical therapy beyond the initial three sessions he received prior to being transferred out of the medical department.  ECF 10.

Plaintiff filed a "motion for not receiving adequate medical care" on January 9, 2014, asserting that a CT scan of his cervical, thoracic and lumbar spine performed at UMMC, as ordered by attending physicians Ibrahimi and Hayman, demonstrated an L5-S1 Pars defect as well as degenerative changes to his spine.  ECF 14 at p. 1 and Ex. A, p. 2.  Plaintiff further states that attending physicians informed Drs. Ali and Luka that plaintiff would need long term pain management.  Despite these reports and recommendations by UMMC physicians, plaintiff

asserts that his efforts to be seen in the chronic care clinic at Western Correctional Institution (WCI) were futile and he had not been seen by Dr. Ottey[3] even though he had been told since December 10, 2013, he would be seen.  Plaintiff further alleged that the pain medication he was provided, Tramadol (200 mg), Tylenol #3 with Codeine, and Bactrim, did not work for his pain. ECF 14 at p. 2.

Plaintiff states that on December 11, 2013, he was sent to the emergency room for chest pains which he relates to the neck and back pain he suffers.  He claims the hospital doctors again told the prison medical staff at WCI that he requires pain management, but that Wexford refuses to allow chronic pain management.  Additionally, plaintiff asserts that despite a recommendation that nerve conduction studies of his lower extremities be performed, those studies were not done. ECF 14 at p. 3.

Defendants Sadik Ali, M.D. and Getnet Luka, M.D. assert that plaintiff has a significant history for neck and back pain accompanied by numbness and weakness in his extremities; hypertension with mild cardiac artery disease; and mental illness which includes bipolar disorder, depression, and post-traumatic stress disorder (PTSD).  They further claim plaintiff is non-compliant with medical orders and has a history of abusive and threatening behavior toward medical staff which includes manipulative as well as narcotic-seeking behavior.  Specifically, plaintiff  has regularly threatened use of the judicial system against medical staff when he does not receive prescription narcotics of his choice upon request.  ECF 19 at Ex. 2 (affidavit of Dr. Sadik Ali).

Plaintiff entered the Division of Correction's Maryland Reception Diagnostic Classification Center (MRDCC) as an inmate on April 24, 2013, where he self-reported taking the following drugs, Tramadol, Tylenol, Neurontin, Zantac,  and Linsopril. He claimed to have

---

[3]  Dr. Ottey is not named as a defendant.

sustained a head injury after falling during a high wire act with Wringling Bros. Barnum & Bailey Circus and that he had fractured his back and neck during a 2011 incarceration. ECF 19 at Ex. 1, pp. 1 – 7.  He reported experiencing chronic pain as the result of his back and neck injury and that he has been provided with a bottom bunk assignment to help address that issue.  Plaintiff also claimed he was allergic to NSAIDs, penicillin, acetaminophen, pseudoephedrine, chlorpheniramine, ibuprofen, Naproxen, caffeine, and aspirin.  In addition to his neck and back pain, Plaintiff reported having hypertension, hyperlipidemia, depression, and post-traumatic stress disorder (PTSD).  *Id*.  Plaintiff was prescribed medication to address the hypertension and Tramadol to address his pain.  Plaintiff was also put on the chronic care clinic list for his hypertension.  *Id*.

 On May 2, 2013, plaintiff was seen by JoAnne Hartung, R.N., for his complaint that he had upper chest pain that radiated down his right arm.[4]  Although Hartung explained to plaintiff that the prescribed Tramadol had not yet arrived, and that due to plaintiff's many allergies nothing else could be prescribed.  Plaintiff indicated he understood, but filed a sick call slip later the same day complaining he had not received his pain medication.  ECF 19 at Ex. 1, pp. 17 – 18, and 788.

On May 14, 2013, plaintiff was examined for his complaints of back and neck pain by Dr. Chhunchha.  Plaintiff told the doctor he had been slammed into a wall while in jail and that he had undergone physical therapy before his incarceration.  At the time of the exam, plaintiff was able to put weight on both legs and he reported that pain radiated to his left leg.  Plaintiff also reported that his left arm felt weaker than his right.  Dr. Chhunchha found no abnormalities, but noted plaintiff's back and spine was tender and ordered follow-up visits every two weeks to assess his back and neck issues.  Plaintiff told the doctor he had not received his Neurontin, but

---

[4]  Plaintiff's vital signs were stable.

said nothing else about other medications.  Dr. Luka approved plaintiff for Neurontin the same day he was seen by Dr. Chhunchha.  ECF 19 at Ex. 1, pp. 19 – 24.

On May 17, 2013, plaintiff was transferred to Eastern Correctional Institution (ECI)  and he was seen by Dr. Jason Clem on May 22, 2013.  Dr. Clem informed plaintiff he could not take Tramadol while at ECI Annex and told him it should not be used long-term.  Given plaintiff's numerous allergies, Dr. Clem noted there were limited pain medication to offer plaintiff and recommended alternatives such as meditation or tai chi.  Dr. Clem made plans to discuss a transfer of plaintiff to another facility where his medical needs could be better addressed.  ECF 19 at Ex. 1, pp. 30 -31.

ON May 29, 2013, plaintiff was sent to Peninsula Regional Medical Center (PRMC) by ambulance after he reported chest pain and an EKG showed a non-specific abnormality.  *Id.* at pp. 32 – 34.  While at PRMC plaintiff was seen by Dr. Carmen Massey.  The EKG performed at the hospital rendered findings within normal limits.  A chest x-ray, however, showed mild degenerative changes to plaintiff's thoracic spine and plaintiff was admitted to the hospital based on his chronic neck and lower back pain.  Dr. Vohra of PRMC admitted plaintiff for further evaluations and plaintiff was later discharged on May 31, 2013. ECF 19 at Ex. 1, pp. 808 – 827.

Upon his return to ECI plaintiff was admitted to the infirmary so he could be monitored more closely.  He displayed no apparent distress and was discharged the following day.  At that time plaintiff was walking without assistance.  *Id.* at pp. 35 – 39.  On June 12, 2013, plaintiff again experienced chest pain on deep breathing.  At this time he complained to Dr. Matera about receiving 325 mg of aspirin a day and requested instead 81 mg of aspirin, which he had taken for years with no problem.  This statement regarding aspirin contradicted plaintiff's earlier claims that he was allergic to aspirin.  *Id* at p. 45.

On June 21, 2013, Nurse Kiggins was called by custody staff on behalf of plaintiff, who reported he could not move.  Upon her arrival, Kiggins saw plaintiff laying half on the bed with his head propped on a chair and his arms up in pain.  Plaintiff stated he missed the bed when attempting to sit down and fell hard on his backside.  He further reported hearing a popping sound in his cervical spine and that he was experiencing pain when he moved.  Additionally, plaintiff complained he was in severe pain, was fearful of injury, and was unwilling to attempt to move.  He claimed he had lost sensation in his left leg and had reduced sensation in his right let with a squeezing sensation in it.  Plaintiff was carefully repositioned and an ambulance was called.  *Id*. at pp. 51 – 59.

Plaintiff was again taken to PRMC where he was seen by Dr. Thimmarayappa who ordered an MRI of plaintiff's lumbar spine.  The MRI results showed "bilateral spondylitic deformity with grade 1 anterolisthsesis and sever narrowing of the right neuro foramen" or a slipped disc.   ECF 19 at Ex. 1, pp. 828 – 59.  Plaintiff's claimed symptoms were not supported by the objective results of medical tests and it was suspected that he was malingering. Nevertheless, he was referred to a neurosurgeon for evaluation.  *Id*.

On June 22, 2013, plaintiff was evaluated by neurosurgeon Dr. Jacek Malik who reviewed plaintiff's MRI and found no significant stenosis, but noted some degenerative disc disease and a slight compression of the right nerve root at L5.  When Dr. Malik examined plaintiff he noted tenderness at the cervical spine as well as weakness in both lower extremities and greater motor function on the right side of plaintiff's body.  While plaintiff claimed he had no sensation in his left leg, he was able to stand on a scale for his weight, which was inconsistent with his neurological exam.  Dr. Malik also noted that plaintiff's complaints did not correlate with the MRI results, but since plaintiff was displaying weakness in the left upper and lower

extremities, Malik ordered another MRI of the cervical and thoracic spine.  Based on those results, Dr. Malik recommended plaintiff  receive a cervical laminectomy, a surgical procedure to relieve pressure from the cervical spinal cord.  *Id.*   The surgery was performed without complication on June 25, 2013, and plaintiff was discharged from PRMC on June 27, 2013.  Plaintiff was instructed to avoid strenuous activity, bending at the waist further than touching his fingertips to his knees, twisting at the waist, pushing, and pulling or lifting more than three to five pounds.  Plaintiff was also instructed to walk at least three times each day.  ECF 19 at Ex. 1, pp. 850- 51.

After plaintiff's return to ECI, he was seen by Dr. Clem on June 27, 2013, who ordered bed rest and prescribed Percocet.[5]  Plaintiff was admitted to the infirmary for monitoring.  Plaintiff was provided with a cervical collar and was informed by nursing staff that it must be in place at all times.  Despite this repeated directive, plaintiff was seen removing the collar, wearing it improperly, and forcing his chin into the top of it.  He was warned that failure to follow post-operative instructions would essentially render the surgical procedure a nullity, but plaintiff continued to disobey the medical orders.  Additionally, plaintiff refused to allow nursing staff to put his bed at a 45-degree angle and refused to cooperate with nursing care.  At one point plaintiff threw a urinal across the floor because he did not get his way; refused to get out of bed with assistance to use the bathroom and urinated on himself even though a urinal was at the bedside; and tossed from side to side, twisting around in the bed despite advice not to do so.  ECF 19 at Ex. 1, pp. 61 – 68.

Plaintiff's behavior worsened during his stay at the ECI infirmary.  He continued to remove the cervical collar or loosen it.  He was observed lying flat on his bed, picking his knees

---

[5]   Percocet is a combination of Acetaminophen and oxycodone use for pain management.  *See* ECF 19-1 at p. 15, n. 18.  Despite plaintiff's claim he is allergic to Acetaminophen , he took Percocet without complication.

up to his chest and twisting his back, all actions contraindicated for the surgery provided to plaintiff.  Nurse Apgar attempted to educate plaintiff about the dangers of removing the cervical collar and failure to avoid the movements he was advised to avoid, but plaintiff was unwilling to accept or acknowledge any understanding of the information provided.  ECF 19 at Ex. 1 at pp. 69-71.  Plaintiff complained that the collar affected his breathing when he wore it the proper way and that he could not eat because he couldn't get up.  *Id.*  at pp. 72 – 73.  When plaintiff was reminded that he would not allow his bed to be raised to a 45 degree angle as directed by his surgeon, he claimed a metal pole in the bed made it uncomfortable.[6]  P.A. Terri Davis also advised that plaintiff's complaint about numbness in his foot may be related to his adjusting or removing the cervical collar against medical advice.  *Id.*

Despite his behavior, plaintiff remained in the ECI infirmary.  He continued to ignore medical directives and became a behavioral problem.  Defendants provide the following examples:

> Observed removing collar several different times during shift.  ECF 19 at Ex. 1, p. 78.
>
> Removed cervical collar multiple times despite education on need and purpose for it.  *Id.* at p. 105.
>
> Walked to the door of A-Ward and hit forehead on door.  Then looked up and hit forehead against the door again.  *Id.* at p. 351.
>
> Verbally abusive and threatening toward staff.  *Id.* at p. 211.
>
> Had angry outburst, took cervical collar off, and threw it on night stand when nurse told him Percocet would be decreased.  *Id.* at p. 292.
>
> Seen moving around ward, wearing collar improperly, and holding walker one inch off the floor.  *Id.* at p. 128.

---

[6]  P.A. Terri Davis advised plaintiff there was no metal in the bed as the mattress was made of foam.  ECF 19 at Ex. 1, pp. 72 – 73.

Seen by nursing staff taking off neck brace and dancing with walker. *Id*. at p. 138.

Seen walking around the ward without cervical collar and moving head side-to-side with full range of motion and no signs of pain. *Id*. at p. 401.

Claimed inability to move or feel left leg, but was witness moving both legs in bed. *Id*. at p. 80.

Reported difficulty moving legs sometimes, but able to move legs at times. *Id*. at p. 91.

Observed walking briskly and later claiming he is in pain. *Id*. at p .281.

Moves without difficulty but claims high level pain scores. *Id*. at p. 298.

Upset about being tapered off Percocet and refused to have vital signs checked. *Id*. at p. 401.

Threatened to sue medical staff for discontinuing narcotic pain medication despite admission he was not in any pain. *Id*. at p. 454.

This behavior took place between June 29, 2013 through September 11, 2013. On September 12, 2013, plaintiff was seen by Dr. Tewelde after complaining of a sudden onset of pain in his neck. *Id*. at pp. 505- 506. Plaintiff claimed he was sitting in a chair and when he stood up he heard a popping sound in his neck and felt an "excruciating pain." *Id*. Tewelde ordered plaintiff admitted to the infirmary, prescribed Percocet, and ordered radiology examinations. *Id*. The following day when plaintiff was seen by Dr. Ali he denied trauma to his neck and no swelling was observed. *Id*. at pp. 508 – 10. He told Dr. Ali that Tramadol and Neurontin did not work for him and requested stronger pain medication. Because tenderness in plaintiff's cervical spine was noted, his grip was weak in the left arm, and his gait fell toward the left side, Dr. Ali prescribed Percocet. *Id*.

On September 14, 2013, plaintiff was observed getting out of bed on his own, placing himself in his wheelchair, and wheeling himself down the hallway. *Id*. at pp. 517- 18. He

reported his pain level was a 3 out of 10 and requested pain medication approximately two hours after receiving same, and threatened to call Wexford if LPN Ibidolapo Onafawa did not give him the medication.  Additionally, plaintiff was again not wearing his cervical collar.  *Id*.

On September 16, 2013, plaintiff was seen by Dr. Ali, who noted that the lower left extremity weakness exhibited by plaintiff does not correlate with the diagnosis, causing Dr. Ali to question the legitimacy of the asserted weakness.  Plaintiff asked for stronger pain medication and denied drug-seeking behavior.  Dr. Ali attempted to perform several tests to determine plaintiff's status, but plaintiff refused to cooperate in a straight leg test.  Dr. Ali's conclusion was that plaintiff had a disc prolapse, but noted that the findings do not add up.  *Id*. at 533- 34.

On September 17, 2013, plaintiff was sent to Bon Secours because he was showing little improvement and there were signs of lower lumbar cord and root compression.  Plaintiff was discharged the same day he arrived, September 18, 2013, and was told to return to the ER if his symptoms persisted.  Doctors at Bon Secours diagnosed plaintiff with cervical radiculopathy.  *Id*. at pp. 541 – 44.

On September 19, 2013, plaintiff showed some improvement and was able to use a walker instead of a wheelchair.  Medical staff observed plaintiff standing on both feet, standing on one leg and then the other to put on pants, and doing so with excellent balance.   Plaintiff offered no complaints and plans were made by Physician's Assistant Carl Oltman to generate a physical therapy consultation.  *Id*. at pp. 551 – 56.

The following day, Dr. Ali noted that although plaintiff was denying pain and admitting his condition was better, he was frequently asking for opiate medication.  When plaintiff was informed it was not time for his medication he began "insulting everybody on the floor."  Dr. Ali attempted to mediate, but plaintiff simply began threatening to sue him.  When Dr. Ali suggested

that plaintiff was malingering in furtherance of his drug seeking behavior, plaintiff threatened Dr. Ali that he would "show Dr. Ali who he was."  Dr. Ali responded to plaintiff's threats by pointing out that plaintiff had been treated properly and had been given the benefit of the doubt in the past regarding his claims of pain and weakness.  Dr. Ali told plaintiff he would not be intimidated by him.  *Id*. at pp. 562-63.   Plaintiff filed the instant lawsuit one day after this encounter.

Plaintiff continued to move around using a walker, but moved with a slight limp in his left leg.  *Id*.  pp. 595 – 98.   He was instructed to perform back muscle strengthening exercises which he agreed to do.  *Id*.  On September 25, 2013, plaintiff was found sitting on the floor of the bathroom by Nurse Adediji.  He stated his legs gave way and complained about pain in his side and his head; however, no bleeding or swelling was seen.  *Id*.  pp. 599-600.  Dr. Ali saw plaintiff the following day and maintained his impression that plaintiff was malingering for purposes of obtaining narcotic medication.  *Id*. at pp. 603 – 4.   PA Oltman also believed plaintiff was using the lingering weakness in his left leg to justify his drug seeking because even though plaintiff complained about the weakness, he was able to walk with it.  *Id*. at pp. 629 – 31.  On October 1, 2013, plaintiff told Dr. Ali he felt better and then asked for Percocet.  Plaintiff was able to walk at that time, but chose not to do so.  *Id*.

On October 2, 2013, Dr. Ali concluded that plaintiff's claims of pain in his lower left leg were not supported by objective clinical evidence and plaintiff's requests were specifically for Percocet, supporting Ali's conclusion that plaintiff was malingering for purposes of obtaining narcotics.  *Id*. at pp. 644- 45.  On one occasion, plaintiff refused to take Tylenol No. 3 because he is allergic to it.   The Percocet plaintiff demanded, however, had the same amount of Acetaminophen in it and plaintiff had taken other drugs containing items he had claimed he was

allergic to in months past. *Id*. at p. 639 – 641.  When plaintiff was confronted with suspicions that he was drug seeking, he threatened to sue everyone. *Id*. at pp. 648 – 651.

On October 7, 2013, Oltman spoke with the infirmary doctor who confirmed that plaintiff is not allergic to Tylenol despite what plaintiff had claimed.  Plaintiff told Oltman that he only wanted to take Percocet and Oltman informed plaintiff that Percocet contains Tylenol.  Plaintiff argured that Percocet had a lower concentration of Tylenol, but Oltman told him that each medication contained 325 mg of Acetaminophen per tablet.  At this point plaintiff stated that if he was not given a stronger opioid medication he would sue the medical staff.  Plaintiff then walked out into the corridor to make a phone call and showed no signs of pain. *Id*. at pp. 680 – 81.

On October 9, 2013, Dr. Ali noted plaintiff was showing improvement with physical therapy, but was still exhibiting signs of lower lumbar cord compression.  Plaintiff had been sent to Bon Secours for an evaluation of his lumbar spine, but the evaluation was not done as requested because, it was later discovered, plaintiff had misled doctors and had them assess his cervical spine. *Id*. at pp. 718 – 20.  Plaintiff was sent to UMMC to be evaluated by Dr. Simar and he returned with a diagnosis of chronic back pain. *Id*. at pp. 707-10.  There was no objective evidence that correlated with plaintiff's claim that his pain was an eight out of ten.  When Dr. Agonfir was informed of the results, all of plaintiff's pain medication was discontinued and plaintiff was re-evaluated by a doctor the following day. *Id*.

Plaintiff expressed his dissatisfaction with the UMMC assessment and told Nurse Royal he planned to sue them.  Plaintiff then left his bed, sat in his wheelchair, and propelled himself around the unit shouting angry outbursts regarding the discontinuation of his narcotics.  While he

claimed his pain was a five out of ten, he was observed talking and laughing with other inmates and moving his arms and legs with no indication of pain.  *Id.*  at pp. 713 – 14.

The assessment done at UMMC did not show any disc prolapse, but did reveal an old "pars fracture." [7]  Dr. Ali attempted to explain the test results to plaintiff, but plaintiff began telling his own version of events and requesting stronger pain medication.   When Dr. Ali explained the doctor at UMMC did not recommend stronger pain medication, plaintiff began to threaten Dr. Ali with a lawsuit.   Dr. Ali continued with his examination of plaintiff and asked him to get out of bed and walk without assistance, which plaintiff did.   Dr. Ali then left plaintiff to treat the next patient.   *Id.* at pp. 718- 20.

Plaintiff was dissatisfied with Dr. Ali's response and continued to boisterously argue about the need for stronger pain medication.   He told Dr. Ali he had sued him and when Dr. Ali responded that plaintiff could do as he pleases, plaintiff became extremely loud and angry. Plaintiff got up from his bed, stood perfectly on both legs, picked up a walker, and attempted to throw the walker at Dr. Ali.   Because another inmate was in the way, however, plaintiff threw the walker to the bottom side of the bed.   Plaintiff told Dr. Ali that if he attempted to treat him again, he would hurt him.   Based on this threat and plaintiff's assaultive behavior, he was moved to another floor and Dr. Ali did not treat plaintiff after this encounter.   After plaintiff was moved to the fourth floor, the medical staff treating him there also suspected he was drug seeking.  *Id*.

### Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Supreme

---

[7]   A pars fracture is a small fracture in the rear portion of the spinal column usually caused by excessive or repeated strain to the area.  ECF 19-1 at p. 33, n. 30.

Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotations omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991).   In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the

16

defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) quoting *Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000); citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

The instant case involves an objectively serious medical condition; however, there is no evidence that any defendant either refused to treat that condition or disobeyed medical orders regarding it.  Indeed, the only party to this case who disregarded medical orders was plaintiff himself.  Plaintiff's disagreement with the choice of pain medication provided to him is simply not a basis for an Eighth Amendment claim.  The care provided to plaintiff, as evidenced by the voluminous record filed in support of the motion for summary judgment, was appropriate and continuous.  Rather than penalizing these defendants with a lawsuit, they should be rewarded for the patience they exhibited in dealing with plaintiff's uncooperative attitude and blatant manipulative attempts to obtain his narcotic drug of choice.  Plaintiff's use of this litigation as a means to threaten medical staff who are simply doing their jobs is offensive and inappropriate.  Defendants are entitled to judgment in their favor.

A separate order follows.


___August 12, 2014___                    ____/s/_____
Date                                                    J. Frederick Motz
                                                          United States District Judge

17